Clebke, J.
 

 (Dissenting.) Bela D. Coe, of Buffalo, by his last will and testament, bearing date March 13th,-1852, devised to his wife Elizabeth, and to her heirs and assigns, forever, his dwelling-house and lot of land in that city, with the appurtenances, and, for and during the term of her natural life, the premises known as “ the Mansion House,” and all and several the rents, issues and profits thereof. He also gives to her, forever, his furniture and stock, and the family pew in the First Presbyterian Meeting House. After devising to two other persons some land at Black Rock, near Buffalo, and providing for the payment of a mortgage on his dwelling-house, and other debts, he bequeathes and devises all the residue of his real and personal estate to the three plaintiffs in this action.
 

 Some time after his death, his widow married the defendant, William A. Moseley, The Mansion House property, which Mr. Coe left to his wife, during her life, was subject to certain leases executed by him, which were unexpired at the time of Mrs. Moseley’s death. The rents of this property were payable quarterly, on the 1st of February, 1st of May, 1st of August, and 1st of November, in each year, except under a supplementary lease upon a portion of the premises, by the terms of which the rent was payable semi-annually on the 1st of November and 1st of May. In fact, however, the rent reserved in this supplementary lease was paid quarterly.
 

 
 *289
 
 Mrs. Coe, .afterwards Mrs. Moseley, became legally possessed of the premises thus given to her for Efe,, and received the rents which fell due during her lifetime.
 

 She died on the 5th of April, 1855, and by her will, which was proved on the 11th of July, following, the defendant was made her sole executor and residuary devisee and legatee.
 

 It will be seen that she died twenty-five days before a quarter’s rent was due; and 'the principal question in this case is, whether her executor is entitled to the proportion of the quarter’s rent accruing up to the 5th of April, 1855, or whether the plaintiffs, as remaindermen, are entitled to the whole quarter’s rent falling due on the 1st of May, 1855.
 

 It will be perceived that the position of Mrs. Coe, in relation to this property, was not that of an ordinary tenant for life, but that of a widow, whose husband, by careful provisions in his will, endeavored, with but a small exception (the devise made in the second section), that she should enjoy, during her life, the whole income of his estate. He gives her the house in which he lived and died, with its grounds, appurtenances, furniture, books, pictures, his horses, harness, barn and garden utensils, barn stock; and he also gives her the family pew. This evidently shows that he intended she should continue the family establishment in its accustomed style; and for this he appropriates nearly the whole income of his estate, which he expressly says she shall enjoy “ for and during the term of her natural life; ” not until two months and five days, or any time, short of her natural life; but for the term, the whole term of it. Can any one say, from the entire plan and context of this will, that he intended to have her income cut short, under any contingency ? Where is the ground for this supposition ? Is it in any principle of law ? Is it in any phraseology employed in the will? He intended one thing or the other; he intended either that she should enjoy this income to the very day of her death, or for a shorter period, absolutely or contingently; certainly not absolutely, and I see no possible pretext for saying that he intended she should have it for a shorter term than that of her natural life, under any contingency whatsoever.
 

 
 *290
 
 As I have said, the dwelling-house was given to her to live in, and the income to defray the expenses of supporting the establishment. We must presume that he expected his wife would expend the income, for this purpose, as it accrued; and, as it became payable, that she would apply it for the payment of her debts and her current expenses. After the quarter day previous to her death, she would employ her rents, then coming in, to defray her household and personal expenses incurred to that day, which, probably, required the whole of the receipts to which she was entitled at that time. But if her estate is not entitled to any proportion of the rent accruing in the subsequent quarter, she would have absolutely nothing with which to support her establishment and defray her personal expenses, for two months and five days. Her money being legitimately expended,, and expended in conformity with the wishes of the testator, in maintaining the family establishment up to the 1st of February, 1855, she would be destitute of resources to satisfy the wonted expenditure, necessary after that time, if she should happen to die one day before the 1st of May, following. Surely he never intended this; at least we find nothing in the. language or scope of the will to warrant such a conclusion.
 

 • It will not be denied, if he said in express terms that his wife should have the due proportion of the quarter’s rents, if she should happen to die before the expiration of the quarter, that her estate would be entitled to it. The rule of the common law, contended for by the respondent, certainly could not deprive her representative of it. I am just as well satisfied, from the language and tenor of the will, that such was his intention, or, at all events, that he contemplated no other intention, as if he had expressly declared it.
 

 These considerations, in my opinion, would be sufficient to determine the principal question in this case; at all events, they show the testator’s intent so satisfactorily, that the rule adverted to must be absolute, unbending, and beyond all question imbedded in our jurisprudence, to warrant its application in this case.
 

 Hoes this ancient rule so positively retain its position in our
 
 *291
 
 law, as to produce this effect? Or has it any vitality at all; or may it not be considered in fact obsolete ?
 

 Undoubtedly, by the common law, in England, rent cannot be apportioned in point of time; and the reversioner, or remain-derman, received the rent accruing on the rent day subsequent to the decease of the tenant for life, whose representative was entitled only to the arrears due at some rent day before his. death.
 

 This rule originated in feudal times; and it arose, in all probability, in part, out of the nature of the services which the vassal rendered to his lord as a compensation for the use of the land, and in part out of the nature of the remedy given to the lord to enforce those services. Those services were, in a great degree, personal and corporeal, accompanied in rent service with fealty and homage. Indeed, from the very name of rent service, for which, to use the language of Littleton, the lord may distrain as of common right, we find it had always some corporeal service incident to it. This service consisted of certain labor, as tilling the land occupied by the lord himself following him, or doing suit to him, in his courts in times of peace, and in his armies, or warlike retinue, in time of war. It would have been extremely inconvenient, and inconsistent with the usage and polity of the times, to have these services apportionable. If the vassal was bound to render one portion of them to one lord, and a second portion to another, he might in those turbulent days, when the barons were continually in strife with each other, be compelled to serve two hostile masters, each having equal claims on him at the same time, and it might have been a violation of his fealty to both to serve either. The service could not, with any kind of convenience, be severed.
 

 So with regard to the great remedy by which the lord was able to enforce his claim on the vassal. It was deemed exceedingly oppressive that the tenant should be subject to two or more several distresses, of two or more several lords; and, therefore, Coke says in his note to section 225, liber 2 of Little-ton: “ If there be lord and tenant, by fealty, and certain rent, and the lord by deed grant the rent in fee, saving the fealty, and
 
 *292
 
 grant farther, by the same deed, that the grantee may distreine for the same rent in the tenancy, albeit a distresse were incident to the rent in the hands of the grantor, and although a tenant attorne to the grantee, yet cannot the grantee distreine; for the distress remains as an incident inseparable to the seignOry, for then the tenant should be subject to two several distresses of two several men.”
 

 These, certainly, are reasons which have no applicability to the condition of society in this country or state, or even modern England; and, I may as well remark here, that many of those ancient rules, which have been incorporated into the common law, are as incompatible with our social and political Structure as many of the maxims of the Koran are with the genius' of Christianity. For this reason alone, they should cease to be part and parcel of our law. The' common law, we know, is not a stiff and inflexible system, immutable, like the laws of the Medes and Persians; but, its distinguishing characteristic is, that it is pliable, accommodating itself to the circumstances of society; and this characteristic is in truth as much a part of the law as any of its direct and positive maxims. The judges, therefore, are not obliged, before they can pronounce a rule obsolete, to wait for the intervention of the legislature. When the reason for the rule ceases, they have the right to renounce it.
 

 I am not aware of any direct and positive recognition, in the courts of this State, of the rule, to the full extent, for which the respondent contends. He claims that it was an undoubted rule of the common law of England; and the common law as it existed on the 19th of April, 1775, in the Colony of Hew York, being the law Of this State, except so far as it has been altered by the legislature, he claims that the rule is in full force now. The answer to this is, that the reason of the rule has ceased; that it is totally repugnant to our social condition; that it is manifestly unjust; that in its application to many analogous cases, it has been abrogated by judicial and legislative authority; and that it is, in this State at least, obsolete. Formerly this into was not confined to rents; and servants’ wages, annuities,
 
 *293
 
 and any payments, payable at stated periods, could not be apportioned. But it is, confessedly, no longer applicable to these cases.
 

 In conformity with this rule, if a tenant for life made a lease for years, and died the day before the rent was due, which was not payable until the last moment of the day upon which it is expressly reserved in the lease, the rent was lost both to the reversioner and the representative of the tenant for life; and the law being so, equity would not relieve. This, however, was expressly remedied in England, by 2 Geo. II, c. 19, § 15; which has been substantially adopted by the legislature of this State. (1 R. S., 747, § 16.) This statute provides “ when a a tenant for life,
 
 who shall have demised lands,
 
 shall die before the day when the rent becomes due, his executors or administrators may recover the proportion of rent which accrued before his death.” Now, there was some reason for the application of the rule to the cases abrogated by this statute. The lessor made a lease for a longer period than he had the power to do; and the sudden termination of it, before the expiration of the term, in agricultural leases, would, in most instances, be very detrimental, if not ruinous, to the tenant. Perhaps, at great labor and expense, he planted and sowed and prepared the land.for the harvest, and, by the unexpected termination of his lease, he would have no means of paying the rent. By the death of the tenant for life, the land becomes worse than useless to him; it causes him probably a severe loss. In such a case, it would appear equitable not to have required any rent from him. And yet the legislature has interfered, and declared that he must pay the proportion of rent which accrued before his death. In cases like that now before us, the lessee would not, in the slightest degree, be prejudiced, and no principle of right be violated by the apportionment. The remaindermen would receive benefit from the property from the day on which they became the owners of it; and the representative of the tenant for life, would receive the proceeds of it, to the day in which he had an interest in it. I cannot suppose that the legislature would have changed the rule in the one case, and retained it with all its obnoxious features in the other, if they considered
 
 *294
 
 that it was still applicable to the latter, or that it had still any vitality. In
 
 Paget v. Gee
 
 (cited in Burns, Justice,
 
 title
 
 Distress), Lord Habdwicke decided in favor of apportionment in analogy to the statute. The facts were these: tenant in tail leased for years, and died without issue a week before the day of payment of the half year’s rent. The lessee, on the day it fell due, paid all the half year’s rent to the defendant, who was the remainderman. The executor of the tenant in tail brought this bill for apportionment of the rent. Lord Habdwicke decided it on two grounds; first, in analogy to the statute; secondly, on the ground that the tenant voluntarily paid the rent, when, in law, he was not obliged to do so. Although, in the latter part of his opinion, he says that he grounds his opinion upon the tenant having submitted to pay the rent, he gives great weight to the first ground. He says, “were it the case of a tenant for years, determinable for lives, he certainly must be included within the act, though it says only tenant for life; it would be playing with words to say otherwise. These cases show the necessity of construing the act beyond the words; as to the equity arising from the statute, I know no better rule than this,
 
 equitas sequitur legem.
 
 Where equity finds a rule of law agreeable to conscience, it pursues the sense of it to analogous cases. If it does so as to maxims of the common law, why not as to the reasons of the acts of Parliament ? Hay, it has actually done so in the statute of forcible entry, upon which the court grounds bills, not only to remove the force, but to quiet the possession.” He remarks that tenants in tail come expressly within the mischief, and that he would be inclined to extend the act to them.
 

 The money, in the case before us, having been collected and in the hands of one of the parties, the question of its distribution is somewhat similar to that in
 
 Paget
 
 v.
 
 Gee.
 
 The tenant has nothing to do with the controversy; he cannot be molested by either party; and the court is merely called upon to declare whether one party should have the whole, and the other party no portion of it, although representing the person who owned the land for by the far greater proportion of the period dur
 
 *295
 
 ing which the rent accrued. Whatever the rule of equity may be, I think we have a right to apply it in an action of this nature. The only respect in which it differs from
 
 Paget
 
 v.
 
 Gee,
 
 is that the rent was paid voluntarily, in the latter case, when the tenant was under no legal obligation to pay it. Neither party had a legal right to the whole, nor to any part of it. The recipient of the rent could not be said to have received it for the use or benefit of the representative of the tenant in tail, without supposing that it was a case within the analogy of the statute, and Lord Hardwick® practically applied the reasoning which I have above copied, to his actual decision. Courts of justice will not interfere to enforce a gratuity, without some semblance of a right, legal or equitable. If, indeed, the tenant had paid the rent to the defendant in that case, with the express direction that a proportion of it should be paid to the representative of the tenant in tail, that would, of itself, be a sufficient foundation for the reason upon which Lord Hardwick® says he grounds his opinion. Nothing of this kind, however, appears in the case, and, therefore, I say that his reasons must have been, in a measure, founded upon analogy to the statute.
 

 But I am inclined to decide this case upon broader grounds: the inapplicability of the rule contended for to the condition of society here, the fact' that it has never been deliberately and expressly recognized, and its obvious hardships and injustice. There is not a particle of reason, founded upon abstract principles of justice, or arising from considerations of convenience or policy, why rents, in cases of this nature, should not be apportioned ; and nothing but the pressure of an indubitable current of authority, should constrain us to recognize so anomalous and so technical a rule.
 

 When I add these considerations to the manifest intention of the testator, I have no hesitation in saying that the judgment of the Superior Court of Buffalo should be reversed.
 

 Davies and Bacon, Js., were also for reversal.
 

 Judgment "affirmed,